## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF
## PENNSYLVANNIA

A.B. an individual,

Plaintiff,

v.

WYNDHAM HOTEL & RESORTS,
INC. AND OM SRI SA, INC. D/B/A
HOWARD JOHNSON BY
WYNDHAM PARTONSVILLE /
POCONOS AREA

Defendant.

Case No. 3:24cv1588

**HON. JUDGE KAROLINE
MEHALCHICK**

## FIRST AMENDED COMPLAINT

COMES NOW, the Plaintiff A.B. ("Plaintiff" or "A.B."), by and through her undersigned counsel, and amends her complaint to make the following averments:

## INTRODUCTION

1.      Plaintiff A.B. is a survivor of human sex trafficking.

2.      A.B.'s life story reads like a tragedy wherein she was forced to endure violence, trauma, exploitation, manipulation, threats, isolation, humiliation, and degradation.

3.      A.B. met a person that groomed her into trafficking. Ultimately, her trafficker came to control every aspect of her life. The defining factor of the

relationship between A.B. and her trafficker was that each night A.B.'s trafficker forced her to have sex with men for money.

4.    A.B. was trafficked at the Howard Johnson located at 1779 N 9th St, Bartonsville, PA 18321 ("Wyndham's Bartonsville Howard Johnson"), that is owned, supervised, managed, controlled, and / or operated by Defendant Wyndham Hotel & Resorts, Inc. ("Wyndham") and franchised to Defendant Om Sri Sai, Inc. ("Om Sri"), (both collectively and individually, "Defendants"). A.B. and her trafficker rented hotel rooms for one purpose—a location to engage in sex trafficking.

5.    At Wyndham's Bartonsville Howard Johnson, A.B.'s trafficker forced her to engage in sexual acts with many men every day. Every new customer was another instance A.B. was forced to have sex against her will—that is to say, multiple times a day, multiple men raped A.B. at this hotel.

6.    A.B.'s trafficker forced her to stay at hotel rooms at Wyndham's Bartonsville Howard Johnson where she was repeatedly raped and forced to perform commercial sex acts with "buyers" or "johns" under threats of physical and psychological abuse.

7.    Defendants knew that human trafficking was happening at this hotel, along with Wyndham's other "branded"[1] properties.

---

[1] Wyndham manages branded hotels, which they often franchise to local

8. Defendants participated in a joint venture or integrated enterprise with one another regarding the operation, control and franchising of the subject Howard Johnson. This involved a common undertaking or a common enterprise, a community of interests, joint rights of control and management, which involved potential profit and risk. They shared office space, employees, management, and policies. Thus, Defendants are vicariously liable for the actions of one another regarding the operation, franchising, and control of the subject Howard Johnson.

9. At some point, A.B. escaped her trafficker and the prison of Defendants' hotel rooms.

10. A.B. has spent a considerable amount of time attempting to regain the life that was stripped away from her because of her trafficking.

11. A.B. brings this lawsuit to hold Defendants accountable who knowingly benefited from participating in a venture which furthered her trafficking.

## **OVERVIEW OF TRAFFICKING**

12. A significant portion of all sex trafficking in the United States of America occurs within the hospitality industry at hotels and motels.

---

companies. As described further in this Complaint, these franchising agreements involve not just mere licensing of intellectual property, but also heavily involved management of the hotels. Several of these brands include "Howard Johnson," "Microtel," Days Inn," "Super 8," "Travelodge," among many others. *See* "Explore All Brands", https://development.wyndhamhotels.com/our-brands/ /.

13. For decades, sex traffickers have brazenly operated in and out of hotels throughout this country. While traffickers indiscreetly paraded throughout hotels, hospitality giants stood on the sidelines and did nothing. Instead, hotels and motels paid only lip service to campaigns against sex trafficking and stood by collecting millions in profits from their trafficking ventures.

14. Wyndham knew and should have known for decades that sex trafficking repeatedly occurs under its brand flags.

15. Rather than taking timely and effective measures to thwart this epidemic, Wyndham chose to ignore the open and obvious presence of sex trafficking on their branded properties, benefitting from the profit and fees created by rooms rented for this explicit and apparent purpose.

16. The sex trafficking industry alone pulls in an estimated $99 billion each year, making it the second largest illicit trade after the sale of all illegal drugs.[2] However, traffickers aren't the only profiteers. The hotel industry, including Wyndham, makes millions from participating in ventures by renting rooms where trafficking victims are sexually exploited night after night. Hotels and traffickers have a mutually beneficial relationship, fueled by the sexual exploitation of victims.

---

[2] *Profits and Poverty: The Economics of Forced Labor,* INTERNATIONAL LABOR ORGANIZATION (2017), https://www.ilo.org/global/topics/forced-labour/statistics/lang--en/index.htm /.

17.    The hotel industry ignored human trafficking on their premises and thereby enabled human trafficking in the United States to flourish.

18.    Wyndham and other members of the hospitality industry are and have long been aware of the prevalence of human trafficking, particularly sex trafficking, at hotels in general and at the Wyndham's hotels worldwide and at their own properties. Wyndham and others in the industry have access to much public information on the prevalence of human trafficking at hotels, including reports by, among others, the Polaris Project created for the use of the hospitality industry.

19.    The hospitality industry, speaking through industry organizations, has in recent years been increasingly vocal about its supposed "unified commitment" to combat human trafficking. Unfortunately, the near-total lack of concrete action by Wyndham and the rest of the hospitality industry shows that the industry in fact has a "unified commitment" to the very opposite:  continuing with business as usual, so that Wyndham and all industry participants continue to profit millions from participating in a commercial venture by renting rooms for human trafficking.

20.    Wyndham's decision to prioritize profits over protecting sex trafficking victims resulted in the repeated sexual exploitation and rape of A.B. on their properties.

21.    A.B., a survivor of sex trafficking, brings this action for damages against Defendants pursuant to the Trafficking Victim Protection Reauthorization

Act, 18 U.S.C. § 1595. Defendants knowingly benefitted from participation in a commercial business venture that involved the potential profits and losses that it knew or should have known to be engaging in sex trafficking acts in violation of 18 U.S.C. § 1591(a).

## **PARTIES**

22. Plaintiff A.B. is a natural person and a resident and citizen of Camp Hill, Pennsylvania.

23. Plaintiff is a victim of trafficking pursuant to 22. U.S.C. § 7102(17) and 18 U.S.C. § 1591(a), and a victim of a "severe form of trafficking" as defined under 22 U.S.C. § 7102(16).

  a. Due to the sensitive and intimate nature of the issues, Plaintiff A.B. requests that this Court grant a protective order pursuant to Fed. R. Civ. P. 26(c) to permit her to proceed under a pseudonym.[3]

  b. Generally, under the Federal Rules of Civil Procedure, pleadings must state the name of all parties.[4] However, there are exceptions

---

[3] In cases where the plaintiffs have demonstrated a need for anonymity, the district court should use its powers to manage pretrial proceedings under Fed. R. Civ. P. 16(b), and to issue protective orders limiting disclosure of the party's name under Fed. R. Civ. P. 26(c), to preserve the party's anonymity to the greatest extent possible without prejudicing the opposing party's ability to litigate the case. *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1069 (9th Cir. 2000).
[4] Fed. R. Civ. P. 10(a).

when the issues involved are of a sensitive and highly personal nature.[5] For good cause, the Court may issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense.[6]

c.  Here, granting pseudonym status and proceeding under seal is warranted because this litigation will involve the disclosure of stigmatizing sexual information, including rape. Plaintiff fears the stigma for her family and friends if her true identity is revealed in the public record.

d.  Plaintiff should not be compelled to disclose her identity. Plaintiff's privacy interest substantially outweighs the customary practice of judicial openness.[7]

---

[5] A district court must balance the need for anonymity against the general presumption that the parties' identities are public information and the risk of unfairness to the opposing party. *See, e.g., M.M. v. Zavaras*, 139 F.3d 798, 803 (10th Cir.1998); *James v. Jacobson*, 6 F.3d at 238 (4th Cir. 1993); *Doe v. Frank*, 951 F.2d 320, 323–24 (11th Cir.1992); *Doe v. Stegall*, 653 F.2d at 186 (5th Cir.); *see also Doe v. Frank* at 323 (11th Cir. 1992) (holding that a plaintiff should be permitted to proceed anonymously in cases involving matters of a highly sensitive and personal nature, real danger of physical harm, or where the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity).
[6] Fed. R. Civ. P. 26(c).
[7] *Does I thru XXIII, 214 F.3d* at 1068 (joining its 4th, 5th, 10th, and 11th sister circuits in holding that a party may preserve his or her anonymity in judicial proceedings in special circumstances when the party's need for anonymity outweighs prejudice to the opposing party and the public's interest in knowing the party's identity).

e.  Moreover, Wyndham will not be prejudiced. Plaintiff will reveal her identity to Wyndham for the limited purpose of investigating Plaintiff's claims once the parties enter into a protective order. Plaintiff simply seeks redaction of Plaintiff's personal identifying information from the public docket and assurances that Wyndham will not use or publish Plaintiff's identity in a manner that will compromise her safety, personal life, personal relationships, or future employment prospects.

24.  **<u>Defendant Wyndham Hotel & Resorts, Inc.</u>** is a large hotel brand with nearly 9,200 branded properties worldwide.[8] Wyndham is a Delaware corporation with its principal place of business in Parsippany, NJ.

25.  Wyndham maintains a registered agent in Ohio, and it can be served through its registered agent, Corporate Creations Network, Inc., at 119 E. Court Street, Cincinnati, OH 45202.

26.  Wyndham is the successor entity to Wyndham Worldwide Corporation and retains successor liability for the wrongful acts of its predecessor. Where applicable, references to Wyndham in this Complaint refer also to Wyndham Worldwide Corporation.

---

[8] *Supra* n. 1

27.    Wyndham owned, supervised, managed, controlled, and / or operated Wyndham's Bartonsville Howard Johnson located at 1779 N 9th St, Bartonsville, PA 18321.

a. The Wyndham's Bartonsville Howard Johnson is a Wyndham brand property.[9]

b. Wyndham employees worked throughout Wyndham's Bartonsville Howard Johnson. Wyndham employees worked jobs including front desk and housekeeping. Wyndham is the principal with control over nearly every element of operations at Wyndham's Bartonsville Howard Johnson. Wyndham is liable, directly, vicariously, and / or indirectly through an agency relationship for acts and/or omissions of the employees at its branded hotels, including Wyndham's Bartonsville Howard Johnson where A.B. was trafficked. Wyndham has an actual and apparent agency relationship with the physical property owners of the Wyndham's Bartonsville Howard Johnson as to establish vicarious liability.

c. Wyndham controlled and dictated the actions and inactions of the Wyndham's Bartonsville Howard Johnson through highly specific and detailed brand standards, policies, and procedures.

---

[9] *Supra* n. 1

d. Wyndham knowingly benefited, or received something of value, from its ventures at the Wyndham's Bartonsville Howard Johnson through royalty payments, licensing fees, and percentages of the gross room revenue generated by the hotel operations, including rates charged through rooms where A.B. was trafficked, as well as in maintaining a positive public image for the Wyndham's Bartonsville Howard Johnson. Wyndham also benefited from gathering personal data from the Wi-Fi it provided to customers including A.B. and her traffickers.

e. Wyndham is subject to the jurisdiction of this Court because it regularly conducts business in Pennsylvania, including through the operation of numerous hotels in Pennsylvania, such as the Wyndham's Bartonsville Howard Johnson, contracting to supply services in Pennsylvania. Wyndham has derived substantial revenue from services rendered in Pennsylvania, has caused injuries to A.B. in Pennsylvania, and profited from a commercial business venture which unlawfully permitted criminals to sell A.B. for commercial sex at the Wyndham's Bartonsville Howard Johnson.

f. Whenever reference is made in this Complaint to any act, deed, or conduct of Wyndham, the allegation is that Wyndham engaged in the

act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of Wyndham.

28.    **Defendant Om Sri Sai, Inc. D/B/A Howard Johnson** is a Limited Liability Company located at 63 Rte 611, Bartonsville, PA 18321.

29.    Om Sri entered into a franchise agreement with Wyndham for Wyndham's Bartonsville Howard Johnson:

   a. Om Sri directly facilitated sex trafficking and participated in other criminal activities at Wyndham's Bartonsville Howard Jonson in the Middle District of Pennsylvania.

   b. The subject of the franchise agreement entered between Wyndham and Om Sri was Wyndham's Bartonsville Howard Johnson, a property located in the Middle District of Pennsylvania.

   c. Om Sri was subject to the reporting requirements in the Franchise Agreement between Om Sri and Wyndham in the Middle District of Pennsylvania.

   d. Om Sri helped open Wyndham's Bartonsville Howard Johnson in the Middle District of Pennsylvania.

   e. Om Sri earned revenue from Wyndham's Bartonsville Howard

11

Johnson through its ongoing operations located in the Middle District of Pennsylvania.

f. Om Sri communicated with Wyndham in the Middle District of Pennsylvania regarding the operation of Bartonsville Howard Johnson.

g. Om Sri was required to purchase insurance for their property in the Middle District of Pennsylvania.

## JURISDICTION AND VENUE

30. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States.

31. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and 28 U.S.C. § 1391(d).

## FACTUAL BACKGROUND

### INTRODUCTION

32. A.B. brings her claims against major hotel brand corporations for violations of the Trafficking Victims Protection Reauthorization Act ("TVPRA") 18 U.S.C. § 1595(a).

33. The TVPRA prohibits Defendants from engaging in any venture they knew or should have known involves trafficking, and thereby establishes a non-

delegable duty of reasonable care to detect and avoid participation in and benefiting from what they know or should know involves trafficking.

34.    An overwhelming majority of commercial sex trafficking transactions occur within hotels and motels, as traffickers use their rooms as the hub for their operations.[10] Inside, the victims are harbored, raped, assaulted, and forced to service buyers who come to the hotel solely to purchase sex.

35.    Hotels offer anonymity, non-traceability, privacy, and discretion, making them ideal venues for sex trafficking.

36.    As part of its conspiracy, to save costs and continually reap millions of dollars in profits, Wyndham generally failed to create, adopt, implement, and enforce company-wide policies and procedures regarding human trafficking (or suspected) at the branded properties. To the extent Wyndham did create, adopt, implement, and enforce company-wide policies and procedures regarding human trafficking or suspected human trafficking at its branded properties, Wyndham ignored the data and/or reporting it received regarding the human trafficking. Furthermore, Wyndham did not train staff how to identify and respond to suspected human trafficking, failed to require training of all employees on human trafficking

---

[10] Bradley Myles, *Combating Human Trafficking in the Hotel Industry*, HUFFINGTON POST (Jul. 22, 2015), https://www.huffpost.com/entry/combating-human-trafficking-in-the-hotel-industry_b_7840754 /.

13

policies and procedures, and failed to conduct audits confirming compliance with policies and procedures.

37. Wyndham ignored the data or reports it had or should have had regarding incidences of human trafficking, instead keeping no reports or data on suspected incidences or occurrences of human trafficking on its properties, the rate at which those occurrences changed as a result of implementing human trafficking policies and procedures, or the number of rooms that Wyndham refused to rent or refunded as a result of identifying the venture as one engaged in trafficking. Wyndham did not establish mandatory and secure reporting mechanisms at the point of sale.

38. Wyndham nonetheless kept reports and / or data on all its branded locations and knew or should have known that Wyndham's Bartonsville Howard Johnson was a hot bed of sex trafficking and criminal activity.

39. Not withstanding the data that demonstrated that Wyndham's Bartonsville Howard Johnson was a hot bed of sex trafficking and criminal activity, Wyndham continued to own, supervise, manage, control, and / or operate Wyndham's Bartsonville Howard Johnson, profiting from ongoing sex trafficking and criminal activity.

40. With little to no risk posed to traffickers seeking to use Wyndham's rooms as a location to force victims like A.B. to engage in commercial sex against

14

her will, the sex trade continues to thrive at Wyndham's branded properties. Everyday victims of human trafficking like A.B. are repeatedly exploited within the rooms of Wyndham's branded properties across the country.

41.    Plaintiff's injuries are indivisible and cannot be separated. Plaintiff's injuries are the result of continued instances of ongoing violent traumatizing sexual exploitation.

42.    As did Wyndham, Om Sri knowingly facilitated human trafficking and criminal activity at Wyndham's Bartonsville Howard Johnson while Wyndham owned, supervised, managed, and / or controlled that property.

43.    Defendants are jointly and severally liable for the Plaintiff's damages in this case.

### THE SEX TRAFFICKING OF PLAINTIFF A.B.

44.    A.B. met her trafficker when she was eighteen (18) years old.

45.    By means of a combination of force, coercion, violence, threats, manipulation, compelled use of and dependency on illegal substances, control over identification documents, and deprivation of basic survival necessities such as, but not limited to, food, water, transportation, shelter, and clothing, A.B. was held captive and sold for sex by her trafficker.

46.    During the time she was trafficked, A.B.'s trafficker frequently rented rooms at Wyndham's Bartonsville Howard Johnson because the rooms provided

convenient, anonymous, and relatively central locations for "johns" that would pay to engage in sex with A.B.

47.    Throughout her trafficking, A.B.'s trafficker connected with "johns" by posting or causing to be posted advertisements on Backpage and Craigslist advertising for A.B.'s availability for commercial sex. A.B.'s trafficker posted many of these advertisements and had conversations with "johns" while connected to Wyndham's Wi-Fi.

48.    A.B. was forced to have sex with multiple "johns" every day she was trafficked in Wyndham's Bartonsville Howard Johnson.

49.    While at Wyndham's Bartonsville Howard Johnson, A.B.'s trafficker violently attacked and beat her, and psychologically tormented her by withholding food and water, all to ensure that she could not escape.

50.    During her captivity at Wyndham's Bartonsville Howard Johnson, A.B. was raped, continuously abused physically and verbally, malnourished, psychologically tormented, kidnapped, and imprisoned.

51.    A.B. encountered the same staff on multiple occasions. Wyndham's staff would have seen the signs of A.B.'s deterioration brought on by the abuse perpetrated by her trafficker, including bruising and physical and verbal abuse.

52.    The trafficker of A.B. followed a repetitive and routine procedure during stays at Wyndham's Bartonsville Howard Johnson to which Wyndham knew

or should have known of A.B.'s trafficking because of a variety of factors detailed below.

## THE SEX TRAFFICKING OF A.B. AT WYNDHAM'S BARTONSVILLE HOWARD JOHNSON

53.    A.B. was trafficked at Wyndham's Bartonsville Howard Johnson located at 1779 N 9th St, Bartonsville, PA 18321. A.B. stayed at this location from February 2013 to October 2013, living at this location.

54.    Each and every day, A.B.'s trafficker interacted with staff at Wyndham's Bartonsville Howard Johnson. The owner provided free rooms to A.B.'s trafficker in exchange for sex with A.B. and other women being trafficked at this location. He warned A.B.'s trafficker when law enforcement was on the property.

55.    The staff at Wyndham's Bartonsville Howard Johnson observed A.B. on countless occasions where it was physically apparent that she was routinely being brutally beaten. She appeared bruised, emaciated, unwashed, sleep deprived and distraught in front of hotel staff

56.    A.B. consistently loudly yelled and fought with her trafficker, begging for someone to help her at all hours of the day and night. Yet no one from Wyndham's Bartonsville Howard Johnson came to A.B.'s rescue by calling the authorities in any other way attempted to help.

57.    Police regularly showed up at Wyndham's Bartonsville Howard Johnson due to trafficking activity and physical violence towards other victims from the numerous traffickers staying at this location, about which Wyndham knew or should have known occurred.

58.    Further, each stay at Wyndham's Bartonsville Howard Johnson resulted in several consistent red flags, including, but not limited to:

  a.  Paying for stays in cash;

  b.  Paying for extended stays on a day-by-day basis;

  c.  Obvious signs of illegal drug use;

  d.  Frequent requests for linen changes;

  e.  Unusually large number of used condoms left in the trash;

  f.  Large numbers of male visitors asking for A.B. and/or her trafficker at the front desk;

  g.  Physical abuse in public spaces

  h.  Visible signs of prior or private physical abuse;

  i.  Loud noises of abuse or other emergency situations audible to staff or other rooms;

  j.  Unusually large numbers of male visitors coming in and out of A.B.'s room;

  k.  Women wearing clothing inappropriate for the weather; and

l.   Loitering / Soliciting on hotel grounds.

59.   Wyndham owned, supervised, managed, and / or controlled Wyndham's Bartonsville Howard Johnson during the time period of A.B.'s trafficking, profiting from her room rentals.

60.   Plaintiff was repeatedly raped and otherwise sexually abused hundreds of times at Wyndham's Bartonsville Howard Johnson.

61.   These red flags were open and obvious to anyone working at Wyndham's Bartonsville Howard Johnson and lasted consistently for at least two years.

**WYNDHAM'S KNOWLEDGE OF SEX TRAFFICKING AT ITS BRANDED LOCATIONS**

62.   Wyndham is aware that the hospitality industry is a major life source of the human trafficking epidemic both in the U.S. and abroad.[11] The United Nations,[12]

---

[11] Giovanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3 /.

[12] *Global Report on Trafficking in Persons,* UNITED NATIONS OFFICE ON DRUGS AND CRIME (2020), 84 8available at https://www.unodc.org/documents/data-and analysis/tip/2021/GLOTiP_2020_15jan_web.pdf /. See also *We must act together to fight exploitation and human trafficking in tourism, say United Nations and international partners,* UNITED NATIONS OFFICE ON DRUGS AND CRIME (April 24, 2012) available at https://www.unodc.org/unodc/en/press/releases/2012/April/we-must-act-together-to-fight-exploitation-and-human-trafficking-in-tourism-say-united-nations-and-international-partners.html /.

international non-profits,[13] and the U.S. Department of Homeland Security,[14] have documented this well-known epidemic of human trafficking for years and brought particular attention to the indispensable role of hotels. Wyndham cannot help but be aware of the public outcry against human trafficking, especially when so much of the uproar surrounds its industry.

63.    For example, in 2004 End Child Prostitution and Trafficking ("ECPAT-USA") launched the Tourism Child-Protection Code of Conduct (the "Code") in the United States, identifying the steps companies would need to take to prevent child sex trafficking. ECPAT-USA identified hotel-specific best practices for preventing sex trafficking, such as: (1) not renting by the hour; (2) not permitting cash payments; (3) monitoring online sex ads such as Craigslist and Backpage for its hotel name and pictures of the rooms; (4) changing Wi-Fi passwords in rooms and cafes regularly; (5) watching for a trend of visitors to the same room; (6) being aware of rooms with excess condoms, lubricants, and towels; (7) requiring all visitors to be

---

[13] The Polaris Project and ECPAT-International have published extensive reports and professional toolkits on human trafficking in the hospitality industry for years.
[14] Human Trafficking and the Hospitality Industry, U.S. DEPARTMENT OF HOMELAND SECURITY (2020), available at https://www.dhs.gov/blue-campaign/hospitalityindustry /; Hospitality Toolkit, U.S. DEPARTMENT OF HOMELAND SECURITY (2016), available at https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf /.

logged, including guest name, visitor name, arrival time, departure time, and room number.

64.   Further, nationwide campaigns have recognized the issue of human trafficking in the hotel industry and the lack of internal policies to address the issue and took initiative as early as 1997 with the United Nations Blue Heart Campaign[15] and domestically in 2010 with the Department of Homeland Security's Blue Campaign.[16] These efforts sought to educate both the public and private sectors on identifying and combatting human trafficking, including the hospitality industry and both campaigns released free online resources and toolkits publicly accessible to any entity concerned with human trafficking.

65.   Wyndham, on information and belief, has access to individual hotel location do-not-rent ("DNR") lists that often list reasons for the refusal to rent, including the suspicion of human trafficking. Wyndham nevertheless does not share such information with other hotel locations, thereby preventing other hotel locations from acting to protect the victims of such suspected human traffickers.

---

[15] *The Blue Heart Campaign,* UNITED NATIONS (2022), https://www.unodc.org/blueheart/#:~:text=The%20Blue%20Heart%20Campaign,help%20prevent%20this%20heinous%20crime /.
[16] *DHS Blue Campaign Five Year Milestone*, DEP'T OF HOMELAND SECURITY (Jul. 22, 2015), https://www.dhs.gov/blog/2015/07/22/dhs-blue-campaign-five-year-milestone /.

66.    Wyndham also has access to public police reports, news reports, and internal reports generated by customers and employees, regarding sex trafficking at their own hotel locations in particular.

67.    Wyndham has access to reviews left by guests on websites such as TripAdvisor, Yelp, Google, and others, wherein guests frequently complain about the prevalence of obvious prostitution, hearing physical violence by pimps, and other signs of human trafficking.

68.    A brief examination of just a handful of examples suffices to show the extraordinary frequency with which Wyndham has long received and continues receiving evidence and reports that human trafficking runs rampant at its hotel locations:

a. Regarding a stay in September 2016 at Wyndham's Bartonsville Howard Johnson, a hotel customer wrote a review saying, "Worst stay of my life. The people were awful, the worker at the front desk was the rudest lady I have ever met, there were prostitutes when we checked in, the building smelled like cigarettes and weed. I wouldn't tell my worst enemy to stay here. The rooms were disgusting, the bedding was dirty and smelled, the room smelt like mold, the bathroom was dirty. This place should be shut down."

22

b.  Regarding a stay in September 2016 at Wyndham's Bartonsville Howard Johnson, a hotel customer wrote a review saying, "WORST STAY OF MY LIFE. We drove over 10 hours to get to Pennsylvania, for a friends wedding. When we got there we were exhausted and were expecting a nice room to rest in before the festivities. When we got to the hotel, the front desk attendant was not helpful at all, and was very rude. The card that i had on file did not work at the hotel, along with 2 others that we tried, which was strange cause they worked at every other place i used them. Nonetheless, we got our room keys and went to our room to relax. When we got the back door to get into our wing, a prostitute came running down the halls with a cigarette in her mouth and nothing on but a towell to open the door...strange. we walked in, and went to our hotel room, which smelt like mold, was not clean, and very unsightly. The bed was uncomfortable, the shower was broken, and there were water stains on the ceiling. the breakfast was bad, there were people smoking weed down the hall from us, the workers there were very un-friendly and to be quite honest, kind of scary... i would never reccomend this hotel to my worst enemy, and would never even consider staying at a howard johnson hotel again. I am surprised that none of my

23

belongings got stolen. this place should be shut down!!!!! Rating this hotel as terrible would be a compliment...."

## OM SRI FACILITATED THE TRAFFICKING OF A.B.

69.   Om Sri harbored and facilitated the providing, maintenance, and exploitation of A.B. at Wyndham's Bartonsville Howard Johnson by providing rooms to sex traffickers despite actual knowledge and / or willful blindness to these activities.

70.   On information and belief, Om Sri reported the widespread and ongoing sex trafficking at Wyndham's Bartonsville Howard Johnson, and Wyndham knew or should have known that this location provided sex traffickers a safe haven and enabling and / or facilitating sex trafficking activity.

71.   Om Sri, together with Wyndham, profited from this widespread and ongoing sex trafficking at Wyndham's Bartonsville Howard Johnson.

72.   The U.S. Attorney's Office of the Middle District of Pennsylvania convicted Wyndham's Bartonsville Howard Johnson's franchise of sex trafficking from 2011 through 2019 in May 16, 2022; the location permanently closed.[17]

---

[17] U.S. Attorney's Office of the Middle District of Pennsylvania, *Hotel Owner, Two Hotel Companies Sentenced for Sex and Drug Trafficking in Monroe County*, https://www.justice.gov/usao-mdpa/pr/hotel-owner-two-hotel-companies-sentenced-sex-and-drug-trafficking-monroe-county /.

73.    Om Sri's acts and omissions were motivated by profit-maximization by means of facilitation of sex trafficking victims, a common undertaking or enterprise involving potential profit and risk engaged in with Wyndham and/or a common undertaking or enterprise involving potential profit and risk engaged in by Defendants and A.B.'s trafficker.

74.    A.B. was trafficked within the trafficking period established in that case[18] at Wyndham's Bartonsville Howard Johnson.

75.    Wyndham owned, supervised, managed, and / or controlled Wyndham's Bartonsville Howard Johnson during the trafficking period established in that case.[19]

76.    Despite having actual and / or constructive knowledge of widespread and ongoing sex trafficking at Wyndham's Bartonsville Howard Johnson, Om Sri and Wyndham continued renting rooms for sex trafficking purposes, providing sex traffickers a safe haven and enabling and / or facilitating sex trafficking activity, providing Om Sri the benefit of Wyndham's reputation by continuing its franchising agreement as long at the profits from A.B.'s sex trafficking was shared with the common enterprise in which has Defendants engaged.

---

[18] *Id.*
[19] *Id.*

77.    Wyndham was aware of the ongoing criminal activity at Wyndham's Bartonsville Howard Johnson established in that case.[20]

## WYNDHAM FACILITATED THE TRAFFICKING OF A.B.

78.    Wyndham is a signatory of the Code[21] and thereby promised to adopt these policies to combat trafficking. Yet, Wyndham, upon information and belief, has either failed to implement most, if not all, these policies, ignored the reporting of the criminal sex trafficking to which A.B. was forced and coerced into at Wyndham's Bartonsville Howard Johnson .

79.    Wyndham is a face and signatory to the ECPAT anti-trafficking knowledge, guidance, and information necessary to prevent human trafficking, and Wyndham publicly committed to participate in the programs shown to assist in identifying and preventing sex trafficking inside its brand hotels. Therefore, Wyndham should not only have created effective Brand standards for implementation, mandates, and operations, but also enforced them or utilized the standards created to impact human sex trafficking instead of ignoring the reported data.

80.    Wyndham profited from the sex trafficking of Plaintiff A.B. Wyndham rented rooms to A.B.'s trafficker when they knew, or should have known, that

---

[20] *Id.*

[21] *See Our Code Members,* ECPAT, https://www.ecpatusa.org/code-members /.

26

human trafficking was prevalent within its branded properties and at the specific locations where A.B. was trafficked. The hotel staff, especially front desk staff, at Wyndham's properties knew or should have known of the obvious signs of A.B.'s trafficking.

81.    Wyndham benefited from the steady stream of income that A.B.'s trafficker and "johns" bring to its hotel brands. Wyndham profited from each and every room that A.B.'s trafficker and customers rented.

82.    Wyndham has made a public commitment to combat human trafficking, and thus, are aware that trafficking is a common problem in the hospitality industry. Wyndham should have been aware of human trafficking occurring at the locations where A.B. was trafficked given Wyndham had access to information, such as police reports, news articles, complaints, and negative reviews regarding the specific locations and surrounding areas.

83.    Moreover, Wyndham repeatedly collected data on A.B., her trafficker, and her "johns" from her many stays at Wyndham's Bartonsville Howard Johnson, including but not limited to room reservations, identification and payment information, data from websites visited on Wi-Fi, and other guest data. Wyndham's employees witnessed the obvious signs of A.B.'s trafficking including signs of abuse, frequent male visitors coming in and out of the room, condoms in the trash, loud yelling and fighting, and others. Despite having access to all this information

for years, Wyndham failed to take reasonable measures to stop sex trafficking from occurring in its hotels, instead ignoring the reported data of sex trafficking to continue to benefit from it If Wyndham had taken proper measures, A.B. and other victims like her, would not have been trafficked at its locations.

84.   Wyndham discussed, developed, and implemented uniform policies and procedures to identify, prevent and mitigate the risk of human trafficking occurring at their properties, including the hotels where A.B. was trafficked. These policies included ongoing communication with its local hotels by including articles about human trafficking in newsletters, announcements at annual conferences, alerts to hotels in high-risk areas or in proximity to high-risk events, and field-based associates who visit hotels specifically to discuss human and sex trafficking issues.

85.   Pursuant to these policies, branded location employees and property management regularly reported customer data and other indicators of trafficking including suspicious criminal activity, web data indicating use of commercial sex websites, and data associated with reservations. The staff at the properties where A.B. was trafficked and reported this to Wyndham or, alternatively would have if Wyndham did not fail to institute reasonable policies and procedures.

86.   In addition, Wyndham had access to much of this data through the management of centralized data systems it required the branded properties to use, including but not limited to the property management, booking, credit processing,

28

and information technology and internet systems. These systems, which Wyndham required its branded properties to use, were either defective in ensuring customer safety and, specifically, identifying and mitigating suspected and actual incidents of human trafficking on Wyndham's properties or were effective and Wyndham ignored the reporting.

87. A reasonably diligent hotel brand in the Wyndham position would have included policies and procedures to identify and mitigate guest safety issues related to human trafficking in its franchise agreements, brand standards, and systems standards. Upon information and belief, Defendants' branded properties would have expected this material to be included in Wyndham policies and procedures. By failing to include such policies and procedures, Wyndham led the branded properties to be negligently managed.

88. Instead, Wyndham negligently required the branded properties to adopt injurious procedures that allowed trafficking to continue and thrive at Wyndham's properties, such as failing to accurately identify customer complaints that raise red flags of trafficking and take meaningful steps to address them. Wyndham provided and operated defective systems for daily property operations, management, policies, procedures, and training that were incapable of determine whether they were generating revenue as a result of renting rooms where victims of trafficking were harbored and sold for commercial sex.

89.    Wyndham voluntarily undertook and assumed a duty to protect the safety of guests at the branded property where Plaintiff was trafficked, such as security, criminal activity, food safety, emergency response protocols, and fire equipment, among others.

90.    Wyndham did not exercise reasonable due diligence and care in selecting franchisees to operate its branded properties. Wyndham failed to conduct background checks and additional investigations to identify customer safety and security risks. Wyndham failed to conduct investigations such as background checks background and additional due diligence to identify whether they sold and licensed their systems and brands to a company able to secure customer safety and security risks.

91.    Wyndham negligently designed the layout and structure of the franchised unit or approved the layout and design of the interior or exterior of the hotel property so that red flags of human trafficking were hidden.

92.    Wyndham failed to take any steps to alert the authorities, properly intervene in the situation, or take reasonable security steps to prevent sexual exploitation on its properties. Wyndham maintained its deficiencies to maximize profits by:

      a.  Failing to mandate and minimizing costs of training employees and managers on how to spot the signs of human trafficking and sexual

exploitation;

b.  Lowering operating costs and management costs by failing to analyze the data they received regarding criminal activity and customer reviews that indicated sex trafficking was occurring and taking the steps necessary to remedy the problems;

c.  Collecting and utilizing massive amounts of data from all of its branded locations for marketing and other profit-driven purposes but failing to utilize this same data to combat sex trafficking in its hotels even when the data showed sex trafficking or possible sex trafficking;

d.  Failing to refuse room rentals, or report guests to law enforcement, in order to maximize the number of rooms occupied and the corresponding rates, even if the rooms rented were to sex traffickers or buyer, which Wyndham knew or should have known because of the relationship with the franchisee involving the potential for profit and loss;

e.  Failing to monitor and track guest wireless network use for illicit commercial sex purposes or digital activity associated with human trafficking.

f.  Failing to institute proper security measures, including, but not

31

limited to, employing qualified security officers or appropriate cybersecurity measures to actively combat human trafficking and sexual exploitation; and

g. Failing to use its power as a parent company hold the franchisees accountable for contributing to the prevalence of sex trafficking on its properties.

93.    As a direct and proximate result of these egregious practices on the part of Wyndham, A.B. and victims of sex trafficking and exploitation like her, have been permanently injured and damaged physically, emotionally, psychologically, and financially.

## WYNDHAM'S CONTROL OVER ITS BRAND HOTELS

94.    In the hotel industry, Wyndham is a major hotel corporation that hold, owns, manages, and operates trademarks, licenses, and standard operating systems for hotel brands. As a parent company with decades of expertise in the hotel industry, Wyndham has the power to provide property owners and franchisees with standard operating systems that control the daily operations and management of Wyndham's branded properties.

95.    Upon information and belief, it is a standard practice in the hospitality industry, followed by Wyndham, for parent companies to set exacting brand quality standards reaching everything from the temperature at which coffee shall be served,

to the number of pillows that shall be placed on each bed, to the types of funds accepted, to when, where and how guests should be greeted.

96.    Wyndham provides its branded properties with signage on and in front of the building intended to assure customers that, if they check into that hotel, they can expect an experience consistent with the standards of the Wyndham hotel brand. The same brand is emblazoned on everything in the hotel, from the pens on the bedside table to the staff uniforms at the front desk.

97.    Wyndham provides its branded properties brand name recognition, a marketing campaign, and hotel listings in the Global Distribution System (GDS) and other online travel agency databases, as well as with access to its brand-wide central reservation systems, 800 numbers, revenue management tools, brand loyalty programs, and company websites. Thus, booking and room reservations are to a substantial extent controlled by Wyndham.[22] Wyndham sees booking and reservation trends, including for those branded hotels where Plaintiff was trafficked.[23]

---

[22] Ellen Meyer, *The Origins and Growth of Franchising in the Hotel Industry*, LODGING MAGAZINE (Apr. 10, 2018), https://lodgingmagazine.com/the-origins-and-growth-of-franchising-in-the-hotel-industry /.

[23] Where a branded hotel allows cash to be accepted for payment, monitoring and auditing these trends are important to identifying locations where criminal activity and commercial sex trafficking may be occurring.

98.     The staffing decisions at the individual hotel locations are sufficiently controlled by Wyndham as to render staff at those locations' agents and joint employees of the brand manager Wyndham and the individual hotel locations. *See M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, 972 (S.D. Ohio 2019).

99.     The staff at individual locations, including the locations at which A.B. was trafficked, took affirmative actions, as agents of Wyndham, to provide lodging to individuals who the staff and Wyndham knew or should have known were engaged in human trafficking, therefore, upon information and belief, Wyndham is directly and vicariously liable.

100.    Upon information and belief, Wyndham requires its branded hotel properties to use a property management system, which is linked to Wyndham's corporate network and data center, for, among other things, receiving reservations, and processing credit card transactions internet and technology, and guest safety.

101.    Essentially, Wyndham provides a hotel in a box. Branded property owners only provide the physical property, while Wyndham provides everything else required to operate and manage the hotel down to the minute details of daily operation. Branded properties must follow Wyndham's strict standards to receive the right to operate one of Wyndham's brands such as the Howard Johnsons.

34

102.    Upon information and belief, per the relevant franchise agreements,[24] Wyndham may enforce their brand standards by means of periodic inspections of its brand hotel locations to monitor compliance. If Wyndham branded properties fail to comply with Wyndham standards, Wyndham may penalize properties with fees and with the ultimate threat of termination of the franchise agreement.

103.    Wyndham exercises day-to-day control over Wyndham's Bartonsville Howard Johnson and its other brand hotels through centralized corporate systems, training, policies, and brand standards. Wyndham implements and retains brand hotel control over, including control over Wyndham's Bartonsville Howard Johnson, where A.B. was trafficked, as either direct subsidiaries or under the terms of its franchise agreements.

104.    Upon information and belief, Wyndham controls the operations of its branded properties through a variety of means enforced through franchise agreements and related contracts, including but not limited to:

    a. Requiring the branded locations to use Wyndham's property management system;

    b. Requiring branded locations to keep audit reports and other records;

    c. Conducting regular inspections, quality assurance evaluation reports,

---

[24] Most franchise disclosure documents, which outline the policies and procedures of franchise agreements, can be accessed publicly for free by making an account on https://fddexchange.com/view-fdd-docs /.

and audits for compliance with franchise agreement terms and Wyndham's corporate policies;

d. Gathering reports of data generated by branded locations including reservation, payment, and occupancy information through Wyndham's centralized systems;

e. Requiring the brands to regularly report data regarding customer feedback to Wyndham;

f. Providing marketing requirements and standardized marketing services for the branded locations;

g. Regulating the all the policies, procedures, and standards of the branded properties from the front desks to the bathrooms;

h. Requiring branded hotels to use approved vendors for internet services or other requirements for Wi-Fi access, security, filtering;

i. Providing training and orientation materials for branded property staff;

j. Requiring branded locations to make modifications to the branded properties upon Wyndham's request and to refrain from make substantial changes to the branded property without Wyndham's permission;

k. Requiring branded properties to comply with Wyndham's Human

Rights Policy and other laws;

l.  Regulating the rates for room rentals; and

m. Insurance coverage requirements.[25]

105.   Wyndham jointly employs all staff located at Wyndham's Bartonsville Howard Johnson, where A.B. was trafficked.

106.   Wyndham manages corporate and branded property training, policies, and procedures on human trafficking, cybersecurity, guest preferences, reward programs, internet access, hotel furniture, amenities, food and beverage, cleanliness, and/or other hotel brand related policies published and communicated via property management systems with back-end management by Wyndham.[26]

107. Wyndham controls uniform and required reservation, marketing, customer support systems and royalty programs at its branded hotels through national press releases, newsletters, emails, announcements on Wyndham's website, and mentions across its corporate media channels.[27]

108.   Through its national sales team, Wyndham controls the credit

---

[25] *See*, *e.g.*, 2014 Super 8 Franchise Disclosure Document, https://fddexchange.com/wp-content/uploads/2015/02/Super-8-Partial-FDD-April-1-2014.pdf /.

[26] *Our Brands*, WYNDHAM HOTELS, https://www.wyndhamhotels.com/wyndham-rewards/our-brands /. (last visited Jun. 15 2022).

[27] *Benefits of Partnering with Wyndham Hotels & Resorts,* WYNDHAM HOTELS, https://development.wyndhamhotels.com/the-wyndham-advantage /. (last visited Jun. 15, 2022).

processing system and the centralized direct billing at its brand hotels, including Wyndham's Bartonsville Howard Johnson where A.B. was trafficked.[28]

109.   Wyndham mandates branded properties source through Wyndham's global distribution system.[29] Wyndham mandates the use of specific vendors and suppliers for the purchase of goods and services at its brand hotels, including Wyndham's Bartonsville Howard Johnson where A.B. was trafficked.[30]

110.   Wyndham regulates property rate, inventory availability, and overall revenue management for the branded locations by monitoring hotel booking data for trends and patterns.[31]

111.   Wyndham manages its branded properties through its Oracle Hospitality OPERA Cloud Property Management System.[32] Wyndham's Development and Sourcing teams negotiate contracts on behalf of brands for hotel

---

[28] *Id.*

[29] *Benefits of Partnering with Wyndham,* WYNDHAM, https://development.wyndhamhotels.com/the-wyndham-advantage /. (last visited Jun. 20, 2022).

[30] *See*, *e.g.*, *id.* (". . . Our goal is to ensure the design and construction of your hotel is as seamless as possible, guided by the appropriate brand standards . . .")

[31] *Id.*

[32] *See* Justin Dawes, *Wyndham is Tapping Oracle Hospitality for Tech at 2,000 More Hotels,* Skift (May 17, 2023), https://skift.com/2023/05/17/wyndham-is-tapping-oracle-hospitality-for-tech-at-2000-more-hotels/ /; *Wyndham Implements Oracle Hospitality OPERA Cloud Property Management In Its Full-Service Hotels,* Hotel Technology News (May 18, 2021), https://hoteltechnologynews.com/2021/05/wyndham-implements-oracle-hospitality-opera-cloud-property-management-in-its-full-service-hotels /.

infrastructure, operating supplies and equipment and food and beverage.[33]

112. Wyndham sets and controls Wi-Fi qualifications and/or Wi-Fi qualified service providers, language and policy used on internet landing pages, thresholds for cybersecurity, filtering and/or other guest internet protections, systems used to monitor customer reviews and responses, and other systems related to the daily operations at its brand hotels, including Wyndham's Bartonsville Howard Johnson where A.B. was trafficked.[34]

113. Wyndham is the employer of the staff at its branded properties, including Wyndham's Bartonsville Howard Johnson. For example, Wyndham posts all hotel jobs on its parent website.[35] Wyndham is also responsible for setting the core values and culture for all Wyndham employees.[36] In addition, Wyndham sets forth policies for, and provides employee benefits.[37]

---

[33] *See, e.g.,* 2021 ESG Report, WYNDHAM, https://corporate.wyndhamhotels.com/wp-content/uploads/2021/04/2021-WH-ESG-Report.pdf /.

[34] *Leveraging technology to deliver an exceptional guest experience,* WYNDHAM (Summer 2021), https://developmentsupport.wyndham.com/files/8516/2869/4484/Tech-Guide-Q3-2021.pdf /.

[35] *Join the Wyndham Family,* WYNDHAM, https://careers.wyndhamhotels.com /. (last visited Jun. 22, 2022)

[36] *About Wyndham,* WYNDHAM, https://careers.wyndhamhotels.com/content/About-Wyndham/#culture /. (last visited Jun 22, 2022)

[37] *Our Benefits,* WYNDHAM, https://careers.wyndhamhotels.com/content/Our-Benefits/?locale=en_US /. (last visited Jun 22, 2022)

114.    Wyndham first adopted a Human Rights Statement in 2007. According to the updated 2018 policy, Wyndham promises to comply with human rights laws and standards and has "accountability mechanisms" in place to monitor and report on compliance. Brand locations are required to comply with human rights and "operating standards." Failure to comply can result in the termination of the franchise agreement.[38]

## CAUSE OF ACTION

### COUNT 1: 18 U.S.C. § 1595 ("TVPRA")

115.    Plaintiff incorporates each foregoing allegation.

116.    Plaintiff is a victim of sex trafficking within the meaning of 18 U.S.C. § 1591(a) and is entitled to bring a civil action under 18 U.S.C. §1595.

117.    Defendants' acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. § 1595. Specifically, Defendants had a statutory obligation not to benefit financially or receive anything of value from a venture that they knew, or should have known, engaged in violating the TVPRA. At all relevant times, Defendants breached this duty by facilitating human trafficking through their participation in a commercial business venture that

---

[38] *Human Rights Statement*, http://q4live.s22.clientfiles.s3-website-us-east-1.amazonaws.com/153757806/files/doc_downloads/governance_documents/Wyndham-Hotel-Resorts-Human-Rights-Policy-Statement.pdf /. (last visited Jun. 15, 2022).

involved potential profits and risks and that involved the harboring of Plaintiff and her trafficker for the purposes of commercial sex induced by force, fraud, or coercion.

118.    Defendants have benefited as a result of these acts, omissions, and/or commissions by keeping operating costs low, maintaining the loyal customer base that fuels the supply and demand of sex trafficking, and limiting mandatory regulations. Moreover, on each occasion they received payment for rooms or received payments or kickbacks for internet usage, Defendants directly benefitted from the sex trafficking of Plaintiff. The actions, omissions, and/or commissions alleged in this pleading were the "but for'" and proximate cause of Plaintiff's injuries and damages.

119.    Plaintiff has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at Wyndham's Bartonsville Howard Johnson.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests judgment as follows:

   a. Awarding Plaintiff all available compensatory damages for each cause of action, including but not limited to past and future medical expenses; past and future lost wages and loss of earning capacity; past and future emotional distress; consequential and/or special

damages; all available noneconomic damages, including but not limited to pain, suffering, and loss of enjoyment of life;

b. Disgorgement of profits obtained through unjust enrichment;

c. Restitution;

d. Statutory and/or treble damages, where available;

e. Punitive damages;

f. Attorneys' fees and expenses;

g. The costs of this action;

h. Pre- and post-judgment interest; and

i. Any other relief the Court or jury deems appropriate.

## <u>JURY DEMAND</u>

Plaintiff hereby demands a trial by struck jury.

Dated: January 15, 2025

Respectfully submitted,

*/s/ Ryan P. Dickinson*

**ANDREOZZI + FOOTE**
Ryan Dickinson, Esq. (332378)
ryan@vca.law
4503 North Front Street
Harrisburg, PA 17110
Tel: (717) 525-9124
Fax: (717) 525-9143

## CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing via electronic mail upon all counsel of record via the Court's Electronic Filing System, and a copy was sent to all non-represented parties via First-Class Mail, postage prepaid.

Date: January 15, 2025

*/s/ Malinda A. Elliott*

**ANDREOZZI + FOOTE**
Malinda A. Elliott,
MLS, Paralegal
malinda@vca.law
4503 North Front Street
Harrisburg, PA 17110
Tel: (800) 706-2764